[No. 29746.  Department Two.  March 21, 1946.]

ALLEN D. HUTCHINGS, *Appellant,* v. THE DEPARTMENT OF
LABOR AND INDUSTRIES, *Respondent.*[1]

[1]Reported in 167 P. (2d) 444.

712

*Griffin & Gershon* and *Russell F. Stark,* for appellant.

*The Attorney General* and *Harry L. Parr, Assistant,* for respondent.

JEFFERS, J.—On or about July 26, 1939, plaintiff, Allen D. Hutchings, was injured while engaged in extrahazardous employment. Plaintiff, while working on the pontoon bridge, lost his balance and fell about fifteen feet into one of the pontoon cells. He thereafter filed his claim with the department of labor and industries. On January 16, 1940, the

supervisor entered an order closing the claim, allowing the claimant time loss and permanent partial disability of 7.56 degrees.

On July 29, 1943, claimant filed with the joint board his application for a rehearing, alleging that he was suffering from numerous disabilities in his back, left hip, and leg, which disabilities were permanent in nature; that prior to the accident he was in perfect physical condition and was suffering from none of the disabilities set forth in his application; that he had suffered a permanent partial disability far in excess of that awarded him by the supervisor. The application was granted on August 9, 1943.

The matter came on for hearing before an examiner on September 9, 1943, at which time the following witnesses were called by claimant: Dr. Joseph Segal, Norman Labrie, Robert Buchanan, and claimant. The matter was continued to October 29, 1943, at which time the department called Drs. Clarence D. Moffatt and John LeCocq. The hearing was further continued to January 7, 1944, at which time the department called Drs. Berens and Brugman.

On March 20, 1944, the joint board entered the following order:

"It is hereby ordered that the supervisor's action of July 13, 1943, in closing the claim with no further award is reversed with instructions to reopen the claim, and to award a permanent partial disability to the left hand and wrist of 14% plus as compared to the amputated value of the left hand at the wrist, in the amount of $256.80; and to award a permanent partial disability to the lumbar back of 10% as compared to the maximum of unspecified disabilities in the amount of $240.00; and to award a permanent partial disability to the left knee and leg of 15% as compared to the amputated value of the leg at the hip, in the amount of $450.00; or for a permanent partial disability award to be made at this time in the total amount of $946.80, less a previous permanent partial disability award having been made in the amount of $646.80, or for an additional permanent partial disability award to be made at this time in the amount of $300.00 and the claim to thereupon close."

Claimant appealed to the superior court for King county

from the decision of the joint board. No claim is made for additional compensation for the wrist.

The cause came on for hearing before the court and jury on November 29, 1944, and thereafter the jury returned the following verdict:

"We, the jury in the above-entitled cause, do hereby render as our verdict the following answers to the following interrogatories submitted by the court:

"INTERROGATORY No. 1. Was the plaintiff properly compensated for his disability to his left leg? ANSWER: Yes.

. . .

"INTERROGATORY No. 3. Was the plaintiff properly compensated for his disability to his back? ANSWER: Yes."

No objection to the form of the verdict was made.

A motion for new trial was made by plaintiff and denied and, on December 15, 1944, the court entered judgment on the verdict, dismissing the appeal and affirming the decision of the joint board.

Claimant has appealed from the judgment entered and makes the following assignments of error: (1) in refusing to admit in evidence the written report of Dr. Leavitt of the condition he found appellant to be in, at the time he examined him, and the treatment recommended; (2) in admitting in evidence a letter purported to be, but not proven to be, written by appellant; (3) in refusing to instruct the jury that the presumption as to the correctness of the decision of the department is not the same when the testimony is taken before an examiner, as when taken before one or more members of the board; (4) in refusing to instruct the jury that the workmen's compensation act applies alike to the young and the old, the weak and the strong, the healthy and the diseased; (5) in refusing to instruct the jury that an injured workman may recover for disabilities to one part of his body, if he proves that they are the result of an injury to some other part of his body; (6) in refusing to instruct the jury that, if the injury lights up a preexisting condition, recovery may be had for the total disability. No exceptions to the instructions given by the court were taken.

We shall take up appellant's assignments of error in the order above stated.

The letter referred to in appellant's assignment No. 1 was written by Dr. Leavitt to the medical division of the department on May 9, 1942, which was prior to the order of the supervisor and prior to the hearing before the joint board. Dr. Leavitt was not called as a witness at the hearing before the examiner. This letter was offered in evidence by appellant at the joint board hearing, and an objection to its introduction and consideration was made at that time by the department, for the following reason:

"MR. CUMMINS: Mr. Gershon, I am marking it, the letter signed D. G. Leavitt, dated May 9, 1942, as claimant's exhibit A. I am just as sorry as you are, Mr. Gershon, that Doctor Leavitt isn't here, but I will have to object that I don't have the privilege of its going into evidence because I don't have the privilege of cross-examining Doctor Leavitt about it, and it is, therefore, a hearsay declaration. I mean that I have to object to it on that basis."

This letter was again offered by counsel for appellant in the hearing before the court and jury, and, upon objection to its introduction being made by the department, the court stated:

"THE COURT: Objection will be sustained. The letter is clearly inadmissible. If your contention were true, they never would get through trying the cases; you would have the right to read every paper in the record."

Rem. Supp. 1943, § 7697 [P. P. C. § 704-1] (formerly Rem. Rev. Stat., § 7697), specifically provides when and under what circumstances the joint board may consider what we shall refer to as the supervisor's record, that is, the record appearing in the departmental files, made and obtained prior to the time the joint board grants a petition for rehearing. We quote from the above section:

"If the Joint Board, in its opinion, considers that the Department has previously considered fully all matters raised by such application [for rehearing] it may, without further hearing deny the same and confirm the previous decision or award, or if the evidence on file with the Joint Board sustains the applicant's contention, it may, without further

hearing, allow the relief asked in such application, otherwise, it shall order a rehearing to decide the issues raised."

However, a different situation relative to the supervisor's record is presented when the joint board grants an application for rehearing. We quote further from the cited statute:

. "If a *rehearing be granted* it shall be heard in the county of the residence of the applicant, or in the county where the injury occurred, at a place designated by the Joint Board, but the hearing thereof may be adjourned from time to time and from place to place within said county, as the convenience of witnesses may require. Such rehearing shall be *de novo* and summary, *but no witness' testimony shall be received unless he shall first have been sworn to testify the truth, the whole truth and nothing but the truth in the matter being heard, or unless his testimony shall have been taken by deposition according to the statutes relating to Superior Courts of this state."* (Italics ours.)

It may be admitted that a consideration of § 7697 is rather confusing as to how much, if any, of the supervisor's record may be considered by the joint board, and how much or what part of such record may or should be included in the record certified by the joint board to the superior court on appeal from the joint board. However, regardless of what may be said relative to some parts of the supervisor's record, we are of the opinion that, under the section just referred to, the letter here in question was not admissible, a proper objection to its introduction having been made before the joint board, and that objection being renewed in the superior court.

By introducing this letter, appellant was attempting to get before the joint board the unsworn statement of Dr. Leavitt, merely because it was a part of the supervisor's record. It seems to us that, under the plain language of the statute,

" . . . but no witness' testimony shall be received unless he shall first have been sworn to testify the truth, the whole truth and nothing but the truth in the matter being heard, or unless his testimony shall have been taken by deposition according to the statutes relating to Superior Courts of this state,"

this letter was not admissible.

On an *En Banc* rehearing of the case of *Sweitzer v. Department of Labor & Industries,* 177 Wash. 28, 36, 30 P. (2d) 980, 34 P. (2d) 350, we specifically stated:

"The former opinion was also erroneous in another particular. It disregarded the contention of respondent that the *report of Dr. Goodnow,* on which the department and the majority of this court in the former decision largely based their opinions, was erroneously received in evidence.

"Rem. Rev. Stat., § 7697, provides, in substance, that the rehearing before the joint board shall be *de novo* and summary, but no witness' testimony shall be received unless he is first sworn to testify the truth, etc., in the matter being heard, or unless his testimony shall have been taken by deposition according to the statutes relating to superior courts of this state. Dr. Goodnow was not called at the hearing in the superior court. He was not sworn as a witness, and under the above cited statute, *the joint board had no right to consider his report, nor did the superior court,* nor this court, both of which heard the case *de novo.*" (Italics ours.)

We have examined the files and briefs in the *Sweitzer* case, and it appears that while the joint board had the claim under consideration, the department wrote a letter to claimant, requesting that he go to Olympia for an examination. Claimant went to Olympia and was examined by Dr. Goodnow, who made a written report of his examination to the board, and it was this report the board considered in reaching its decision. Dr. Goodnow never appeared before the joint board as a witness and, of course, never was sworn to testify relative to any matter in issue. It was the above report we held the joint board had no right to consider, nor did the superior court or this court, because of the provisions of § 7697, *supra.*

We also desire to call attention to *Smith v. Department of Labor & Industries,* 176 Wash. 569, 30 P. (2d) 656, wherein it was held that the report of arbitrators could not be received for any purpose, because of the provisions of § 7697 to which we have referred.

In *Brown v. Department of Labor & Industries,* 23 Wn. (2d) 572, 161 P. (2d) 533, the joint board affirmed the action of the supervisor and refused to reopen the claim. Claimant appealed to the superior court, where the case was tried

to the court and jury. The jury returned a verdict for claimant. This verdict was set aside upon motion of the department for judgment notwithstanding the verdict. From the judgment entered, claimant appealed to this court and assigned as error the court's refusal to allow the entire departmental file to go to the jury. At the beginning of the trial, counsel for appellant offered in evidence what he referred to as the entire departmental file, and urged that it be submitted in evidence subject to examination by the jury. Counsel for the department objected to the admission in evidence of the entire record, and the court, stating that the question to be determined was merely one of aggravation brought before the court on appellant's appeal from the order of the joint board closing her claim and denying her further compensation, sustained the objection to the admission of the entire record on file. The opinion states:

"Appellant argues before this court that the court erred in excluding any portion of the departmental record. The burden, however, rests upon appellant to show that at least some part of the excluded portion of the record had evidentiary bearing upon the *issue* presented before the trial court, which appellant herself defined according to the above quotation from her brief. *Wintermute v. Department of Labor & Industries*, 183 Wash. 169, 48 P. (2d) 627." (Italics ours.)

The statement last above made was undoubtedly based upon what this court said in *Wintermute v. Department of Labor & Industries*, 183 Wash. 169, 48 P. (2d) 627. We quote:

"At the trial in this case, after much of the record had been introduced or read in evidence before the jury, the appellant offered the whole record as such. The offer was rejected. No offer was then made of any particular instrument or part of the record. The ruling rejecting the offer of the whole record is assigned as error.

"The record in this case contains much more than one hundred separate instruments, a large part of which became a part of the record prior to the closing of the claim [by the supervisor] in December, 1931. The instruments are of the kind usually found in such departmental proceedings, consisting of letters, statements, expense accounts, unsworn re-

ports, depositions, etc. A most casual examination of them shows that many, if not nearly all of them, throw no light on the questions that were to be decided by the jury. In the argument on this assignment, counsel for appellant does not specify or identify any one of the instruments, not in evidence, which, it is claimed, would in any manner have helped its case. For aught that appears, there is at least no prejudicial error suggested or, as we are advised, presented by the argument upon this assignment of error."

After referring to the *Wintermute* case, but not quoting therefrom, the opinion in the *Brown* case, *supra,* continues:

"In the case of *Sweitzer v. Department of Labor & Industries,* 177 Wash. 28, 30 P. (2d) 980, 34 P. (2d) 350, this court, by its *En Banc* opinion rendered on rehearing of the case, held that a report of an examining physician in such a case as this made prior to a hearing before the joint board, could not be considered by the superior court on appeal by the claimant from the order entered by the joint board, the physician not having testified before the board either personally or by deposition as provided by Rem. Rev. Stat., § 7697 [P. C. § 3488]."

The judgment was affirmed.

The *Brown* case made no reference to *McKinnie v. Department of Labor & Industries,* 179 Wash. 245, 37 P. (2d) 218, or *Devlin v. Department of Labor & Industries,* 194 Wash. 549, 78 P. (2d) 952, cited by appellant in the case at bar to sustain his contention that the report of Dr. Leavitt should have been admitted because part of the supervisor's record.

We have examined the briefs and files in the *Devlin* case, *supra,* because it is especially relied upon by appellant to sustain his contention. It may be admitted that it appears from the opinion that a report of the department's investigator, concerning Devlin's death and injury, and the autopsy report were held to be admissible because they were a part of the departmental file and were considered by the board when it rejected respondent's claim. There is no question but that the investigator's report was made while the supervisor was investigating the claim and prior to his action thereon and, of course, before any hearing by the joint board.

The report was a part of the supervisor's record transmitted to the joint board, when the application for rehearing was granted.

The admission of this report not only violated the hearsay rule, but permitted the unsworn statement of the investigator to be received in evidence and considered by the joint board. This report not only contained what Frank L. Hapka, the investigator, had discovered from an examination of certain records, but also purported to relate what the chief engineer at Firlands (where Mr. Devlin was employed) stated, and also what Mr. Underhill, accountant in Public Safety Building, and Dr. H. H. Kretzler, the attending physician, had told him. However, it appears that the joint board had submitted the entire departmental file to a commission of four physicians, one of whom performed the autopsy. This commission made a report, wholly *ex parte*. The joint board, after a consideration of the entire record, including the report of the commission and the report of the investigator, found that respondent's testimony failed to prove an injury within the meaning of the act and entered an order that the action of the supervisor in rejecting the claim be sustained.

The claimant appealed to the superior court, and the case was tried to the court and jury, a verdict being returned in favor of claimant. Judgment was entered on the verdict, remanding the cause to the department with instructions to pay claimant such compensation as she was entitled to under the statute. The department appealed.

In view of the situation presented in the above case, the decision might well have been sustained regardless of § 7697, *supra,* on the theory that the department itself introduced the entire record, relied upon the report of a commission based on that record, and specifically relied upon the report of the investigator, which report, the department contended on appeal, was erroneously admitted. Under the foregoing record, clearly the department was in no position to claim the report of the investigator or the autopsy report was not properly admitted in evidence. We appreciate, however, that it can be reasonably argued that the investi-

gator's report and the autopsy report were admissible and entitled to be considered by the joint board *merely because they were a part of the departmental record,* and that the opinion so holds, as the opinion refers to *McKinnie v. Department of Labor & Industries, supra,* wherein this court, without referring to the *Sweitzer* case, passed upon the admissibility of the testimony of the widow of the deceased as to what her husband told her, and the testimony of the family physician as to what the deceased told him, which testimony was objected to by the department as hearsay, the court saying:

"The testimony, technically speaking, may not have been admissible under the strict rules observed in court proceedings, but under Rem. Rev. Stat., § 7697 [P. C. § 3488], found in the workmen's compensation act, hearings upon appeals to the superior court are *de novo,* and informal and summary. Under the statute and practice, all proceedings before the department, *prior to a hearing before the joint board,* are informal, and uniformly include unsworn reports of investigators and physicians, which consist more or less of hearsay with respect to the case, much of it gathered from members of the injured person's family or friends and associates, all of which reports are, by statute, made a part of the record and required to be filed as such and transmitted to court upon appeal.

"The manner in which such statements get into the record may affect the weight to be given to them, but, in our opinion, *they are not incompetent or inadmissible,* and may be considered for what they are worth." (Italics ours.)

The *McKinnie* case was tried to the court without a jury.

After a careful consideration of § 7697 and the cases cited, we now conclude that, when the joint board *grants a rehearing,* and at such hearing before the examiner or the joint board either party to the proceedings properly identifies and offers in evidence the unsworn statement of a doctor, investigator, or other person, and a proper objection is made to the introduction of such exhibit, such objection being renewed on appeal to the superior court, the trial court is justified, under the statute, in refusing to admit such exhibit in evidence either for the consideration of the court, where the case is tried to the court, or of the jury in case of a

jury trial. In other words, the *mere fact* that any such report is a part of the supervisor's record, is not sufficient, after a *rehearing* is granted by the joint board, to permit the board or the court or jury to consider such report.

We therefore reaffirm the rule announced in the *Sweitzer* case, *supra,* and hereby expressly overrule the *McKinnie* and *Devlin* cases, in so far as the two cases last referred to announce any rule contrary to what we have stated herein.

In view of the apparent confusion which exists in the department and among the members of the bar, relative to the admissibility and consideration of the supervisor's record *after a rehearing has been granted by the joint board,* we now announce the following general rules.

After a rehearing has been granted by the joint board, either party desiring to submit to the joint board some part or parts of the supervisor's record, shall properly identify and offer in evidence before the board such part or parts of such record as it desires to have considered. If no objection is made before the joint board to the introduction of such record, it shall be received and considered by, and become a part of the record of, the joint board. If, however, a proper objection is made to the introduction of such record, the board shall note the objection, and, if an appeal is taken from the decision of the joint board to the superior court, and the objection is renewed before that court, the trial court shall pass upon the objection and determine by the rules of evidence whether or not the part or parts of the record offered are admissible. If the court determines that such record is admissible, it shall be admitted and considered by the court, or if a jury is in attendance, read to the jury the same as the oral testimony taken before the board. If the court determines that it is not admissible under the rules of evidence applicable in civil cases, the record shall not be admitted or considered. Any party aggrieved by the action of the trial court may have the action of such court reviewed on appeal to this court. The joint board, in certifying its record to the superior court, shall include the part or parts of the supervisor's record offered in evidence

before it, regardless of whether or not an objection to its introduction was made.

We are of the opinion the rules last above announced do no violence to § 7697, *supra,* of the workmen's compensation act, and may tend to eliminate much of the supervisor's record not considered material to a determination of the issues involved.

■ Assignment of error No. 2 relates to the admission of a letter written by appellant to Dr. LeCocq under date of February 4, 1943. This letter states:

"I made a special trip to Olympia last Monday to see Mr. John Shaughnessy, supervisor of industrial insurance. In view of my present physical condition I asked him for a commission examination. He readily agreed. I asked to have you on the commission and he also agreed to that. I felt that as you had been associated with my case since I was hurt, that that part would help, even though I was Dr. Edwards' patient. I also felt that you would give me a good examination and a square deal. I also asked for Dr. Moffatt on the commission and he agreed. Mr. Shaughnessy said he'd contact you soon in regards to the examination.

"Hoping to see you soon,
"Yours truly,
"(Sd.) ALLEN D. HUTCHINGS"

It appears from the testimony of Dr. LeCocq that he was appointed by the department as one member of a commission to examine appellant, and that he did examine him; in fact, it appears that he had seen and examined appellant from the time of his injury in July, 1939. The doctor had seen appellant while he was in the hospital, had examined X rays, and had last examined him on March 5, 1943. The above letter was offered before the joint board by the department on the redirect examination of Dr. LeCocq. An objection to its introduction was made by counsel for appellant. It was again offered in the superior court and, over appellant's objection, was admitted.

While we are of the opinion the letter was neither competent nor relevant and should not have been admitted, we are further of the opinion its admission did not constitute

prejudicial error sufficient to warrant the granting of a new trial.

■ Assignment of error No. 3 is based upon the refusal of the court to instruct the jury relative to the *prima facie* correctness of the decision of the joint board, where the evidence is taken before an examiner.

The same assignment of error was made in the case of *Dick v. Department of Labor & Industries, ante* p. 423, 165 P. (2d) 853, where the same proposed instruction as in the instant case was offered and refused. Instruction No. 13 given by the trial court in the instant case, to which no exception was taken, is practically the same as instruction No. 7 given in the *Dick* case, *supra.* For the reasons assigned in the *Dick* case, we are of the opinion the court committed no error in refusing to give the proposed instruction in the instant case.

Appellant's fourth and sixth assignments of error are argued together. The fourth assignment is based upon the refusal of the court to give the following requested instruction:

"You are instructed that the workmen's compensation act was enacted in furtherance of sound public policy, for the benefit of those who engage in extrahazardous employment. It applies to all alike, the young and the old, the weak and the strong, the healthy and the diseased.

"One of the hazards of an employment to a workman with a quiescent infirmity is that his work may involve accidents, exertions and strains which his weakened condition may be unable to withstand."

Assignment of error No. 6 is based upon the refusal of the court to give the following requested instruction:

"You are instructed that if an injury lights up or makes active a latent or quiescent infirmity or weakened physical condition, whether congenital or developmental, then the resulting disability is to be attributed to the injury and not to the pre-existing physical condition. Under such circumstances, if the accident or injury complained of is the proximate cause of the disability for which compensation is sought, the previous physical condition of the workman is immaterial, and recovery may be had for the full disability, independent of any pre-existing or congenital weakness."

In support of his contention relative to the two proposed instructions, appellant states in his brief:

"The plaintiff testified that he had followed hard manual labor continuously, working in the fruit orchards and doing building construction labor all without any difficulty prior to the accident; he testified to great difficulties in his back and leg and other parts of his body after the accident. The department in its defense offered evidence to the effect that plaintiff had deformities in his body from the time of his birth. That these were congenital conditions."

■ We are unable to follow appellant in his argument. In the first place, these instructions were not proper statements of the law, and certainly not as applied to the facts in this case. There was no claim made by the department that any congenital defect appellant may have had in any way was affected by the injury, or had anything to do therewith, nor do we find any evidence to the effect that any congenital defect which appellant may have had was made active or lighted up by the injury.

We shall refer to the testimony of Dr. Moffatt, from which appellant quotes in his brief:

"Q. Do you recall about when it was that you first saw Allen Hutchings when he first called at the Seattle Orthopedic Clinic, I mean, when you first saw him? He had been a patient? A. Yes, sir. Q. And under Dr. LeCocq? A. LeCocq and later Darrell Leavitt. I first saw him sometime in August, 1942. Q. And of what was he complaining then, Doctor, Generally? A. Complaint was that—mostly to his low back: He complained of pain in his low back after working or after being on his feet. He had very little complaint in his left wrist or left thigh, to the best of my recollection. He had been under treatment by Dr. Leavitt for treatment of his low back pain. Q. And what, if anything, did you recommend when—strike that. Did he come in several times, Doctor, that fall? A. Yes. I must have seen him between five and seven times between August and December of 1942. Q. And what did you recommend, Doctor, to him? A. It had been previously recommended that he try a support, so, since he was still complaining and obtained very little relief from vaccines and physiotherapy, I advised that he try a support and ordered this support from Cullen Brace Company. . . . Q. Then, after December, was the next

time you saw him to examine him with Dr. John LeCocq and S. N. Berens on March 5th, 1943, Dr. Moffatt? A. To the best of my knowledge, March 5th, 1943, was the next time I saw Mr. Hutchings. Q. And at that time you three doctors gave a commission examination? A. That is correct. . . . Q. Then what history—work history did he give you at that time? A. Mr. Hutchings stated that he was working at that time as an assistant elevator starter in the County-City Building. Q. He had no complaints about his left wrist at that time? A. No. He had no complaints about his left wrist. Q. What did he say about the trouble in his back with reference to his work, if anything? A. He stated the pain in the low back varied with the changes in the weather; also, it varied in severity from day to day. Q. What did your examination reveal of him, Doctor? A. I will give you this here. Q. Give us the detail of it, yes? A. Examination revealed a little bit of a man, weighing approximately one hundred thirty pounds, not suffering any acute pain and in apparent good health. He had slight atrophy of the left buttock and very slight limitation of flexion of the left hip. Measurements of the lower extremities at the eight-inch level, left thigh measured 18½; the right thigh, at the eight-inch level, 19 inches. At the twenty-three-inch level, the left calf measures 12½ inches; the right, 12½ inches. There is no shortening of the lower extremities. Q. That means of the legs, Doctor? A. The legs. Straight leg raising can be performed to 85 degrees on each side; all motions of the upper extremities back, hips, knees, ankles are normal. As a matter of fact, during the examination, we were unable to put the patient through exercise or motion which caused him to complain of pain. The only motion which produced pain was complete hyperextension. Q. What motion is that? A. That is a bending backward or arching the spine backward. Deep reflexes were present and equal on both sides of the body. Q. What does that indicate, Doctor? A. That his nerve functions of the lower extremities were apparently normal. Q. Did you examine the x-rays on that occasion? A. There was no sensory changes in any of the skin surfaces. Q. Did you examine the x-rays, Doctor, that were in the department file at that time? A. We did. The x-rays examined at that time were gone over carefully, including the original x-rays. The more recent x-rays—they all revealed healing of the fractures with callus [hip and wrist]. X-rays of the spine showed a spina bifida of the sacrum. Q. What does that

mean, is that a congenital thing? . . . Q. What is a spina bifida? A. A congenital anomaly in which the lamina of the spine do not completely close. In other words, it leaves a small or great opening of the lamina. . . . Q. What was your final opinion about this man's condition at that time? A. We concluded after our examination and questioning that the patient was some better than on his previous examination several months ago. The patient attributes this improvement, at least in part, to the use of a Knight brace."

After some colloquy between counsel, the witness continued: "A. There was no evidence of aggravation of his back condition." The witness was again interrogated and then continued:

"A. At the time, no further treatment was recommended. The patient had already been awarded 10% of the maximum allowed for unspecified disability to cover his complaints regarding his back. It was our impression that that was entirely adequate, and we recommended no further permanent partial disability award."

Both Dr. LeCocq and Dr. Moffatt, while using different language, testified that the original injuries consisted of a fracture of the left wrist, left hip, injuries to his back, and a cut over the left eye. There was no testimony that there was an injury to the bone structure of the back, nor that any congenital condition of appellant's back had anything to do with his pain in the back; in fact, Dr. Segal, called by appellant, specifically testified that the injury to the back was a muscular injury. He stated:

"Q. It is a muscular injury of the back that you are fixing his disability for, not on any bony injury of the back? *There is no bony injury of the back?* A. No, and the bone is healed. It has injured the muscles that—that is what I really meant. I took it for granted you would understand me." (Italics ours.)

The court committed no error in refusing to give appellant's requested instructions upon which assignments of error Nos. 4 and 6 are based.

■ Assignment of error No. 5 is based upon the court's refusal to give the following requested instruction:

"You are instructed that an injured workman may recover for permanent partial disability to one part of his body, if he proves by a fair preponderance of the evidence that such disability is a proximate result of his original injury, whether to the same part or to some other part of his body."

In support of this assignment, appellant states in his brief:

"In the absence of an instruction containing the principle of law as was contained in our requested instruction No. 11, above set forth . . . a plausible argument could be made by one juror to another that the disability in the claimant's leg was caused by sciatic nerve injury and there was no proof that the nerve itself received any injury when he fell to the concrete floor on the date of his accident. It was in an effort to obviate the force of any such argument that we asked the court to give the above and foregoing instruction."

Again we are unable to follow the argument of counsel for appellant, for we can find no testimony in this case upon which a juror could possibly argue there was any injury to the sciatic nerve. The testimony relative to the sciatic nerve was, for the most part, brought out by counsel for appellant on cross-examination, although there was some evidence in regard to this nerve brought out on direct examination both by the department and appellant. We quote from the cross-examination of Dr. Berens:

"Q. [By counsel for appellant] Yes, and when you saw him eleven months later, Doctor, he still had complaints in the left lower extremity, did he not? A. Yes. Q. Those complaints would undoubtedly be attributable to some sciatic irritations, would they not? A. I have no knowledge that they were. As a matter of fact, we felt they were the result of the fracture of the hip and the cast that had been —had to be applied, immobilizing the hip for a considerable period of time. Q. Well, Doctor, if a patient feels pain in the thigh following a back and hip injury, that is usually attributed medically to pressure on the sciatic nerve, which runs down the thigh?"

After objection the doctor continued:

"A. No; as a matter of fact, that is not true, because there are many injuries of the back and thigh which are not the

result of the injury to the sciatic nerve, and *I had no indication at the time I examined him that this patient ever had an injury to his sciatic nerve."* (Italics ours.)

Dr. Moffatt, on cross-examination, testified that pain or aches in the left hip and lower part of left thigh would not, in his opinion, be attributable to pressure on the sciatic nerve.

On direct examination, Dr. John LeCocq testified as follows:

"Q. Did you, as a result of your examination, find that he had any pressure upon the sciatic nerve, Doctor, do you know, down his left leg? A. He had no evidence of pressure, that is, there was no sensory changes, no reflex changes."

On cross-examination by counsel for appellant, Dr. LeCocq testified:

"Q. Is it not true, Doctor, that subjective complaint of pain and the finding of atrophy are also corroborative factors of pressure on the sciatic nerve? . . . A. I feel definitely not in Mr. Hutchings' case. All his atrophy is due to the fracture he had of the hip, and it is always attended by atrophy of the thigh muscles, which persist over a long period of time."

As stated, we find nothing in this record which would have warranted the trial court in giving the requested instruction, and no error was committed in the court's refusal to give it.

It may be stated in conclusion that the testimony is that the fracture of the hip was well united and in good position.

We are of the opinion there is no reversible error in this record, and therefore the judgment of the trial court entered upon the verdict of the jury must be, and it is, affirmed.

DRIVER, C. J., BEALS, BLAKE, and ROBINSON, JJ., concur.

_____

April 11, 1946. Petition for rehearing denied.